**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**


KEVIN HOLMES                                                    CIVIL ACTION

VERSUS                                                          NO. 15-5943

N. BURL CAIN                                                    SECTION: "H"(3)


<u>REPORT AND RECOMMENDATION</u>

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Kevin Williams, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On November 11, 2011, he was convicted of second degree murder and attempted second degree murder under Louisiana law.[1]  On December 12, 2011, he was sentenced on the murder conviction to a term of life imprisonment and on the attempted murder conviction to a consecutive term of fifty years imprisonment.  It was ordered that those sentences be served consecutively and without benefit of parole, probation, or suspension of

---

[1] State Rec., Vol. 5 of 7, transcript of November 11, 2011, pp. 56-57; State Rec., Vol. 1 of 7, minute entry dated November 11, 2011; State Rec., Vol. 1 of 7, jury verdict form.

sentence.[2]  On May 16, 2013, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[3]  The Louisiana Supreme Court then denied his related writ application on January 10, 2014.[4]

On January 9, 2015, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on March 31, 2015.[6]  His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on May 13, 2015,[7] and by the Louisiana Supreme Court on October 23, 2015.[8]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief.[9]  The state filed a response conceding that the application was timely but arguing that petitioner's claims should be denied.[10]  Petitioner filed a reply to the state's response.[11]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

---

[2] State Rec., Vol. 5 of 7, transcript of December 12, 2011; State Rec., Vol. 1 of 7, corrected minute entry dated June 3, 2013.
[3] State v. Holmes, 119 So.3d 181 (La. App. 5th Cir. 2013); State Rec., Vol. 1 of 7.
[4] State v. Holmes, 130 So.3d 318 (La. 2014); State Rec., Vol. 1 of 7.
[5] State Rec., Vol. 1 of 7.
[6] State Rec., Vol. 2 of 7, Order dated March 31, 2015.
[7] State v. Holmes, No. 15-KH-255 (La. App. 5th Cir. May 13, 2015); State Rec., Vol. 2 of 7.
[8] State v. Holmes, 177 So.3d 1058 (La. 2015); State Rec., Vol. 2 of 7.
[9] Rec. Doc. 3.
[10] Rec. Doc. 10.
[11] Rec. Doc. 11.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## II.  Facts

Petitioner and his co-defendant, Darius A. Duckett, were tried together for and found guilty

of the second degree murder of Marvin Newman and the attempted second degree murder of Teri

Creagh.  On petitioner's direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized

the facts of this case as follows:

> On the night of August 22, 2009, a party was held in the 3000 block of Mt. Kennedy Drive in Jefferson Parish.  A 9-1-1 call was made after several gunshots were heard.  Deputy Shannon Sims of the Jefferson Parish Sheriff's Office responded to the call within a minute and saw a black male lying on the ground about a block and a half from Rochester and Mt. Kennedy, his clothes covered in blood.  Although the victim was still alive, he was not responsive.  Deputy Sims did not find a gun in the victim's clothing, in his hand, or in the area around where

he fell.  EMS arrived and transported the victim to West Jefferson Medical Center.
The 20-year-old victim, Marvin Newman, died from multiple gunshot wounds.[FN 4]  Another victim, Teri Creagh, was shot in her left thigh, and was taken to West
Jefferson Medical Center as well.

> [FN 4]  According to Dr. Karen Ross of the Jefferson Parish
> Coroner's Office, the multiple gunshot wounds all contributed to the
> victim's death.

Candice Cobena was at Lakeyda's[FN 5] house on Mt. Kennedy Drive for
a party on August 22, 2009.  She was outside the house, arguing with Marvin
Newman, whom she had previously dated.  She said that defendant, Kevin Holmes,
whom she knew as "Chopper," arrived in a gold G6 Pontiac and pulled up in front
of Lakeyda's house, but did not get out of the car.  The car door opened, and
defendant was seated in the driver's seat.[FN 6]  She also noticed that "Whop"
pulled up in a green Pontiac, but parked on the opposite side of the street across
from Lakeyda's house.

> [FN 5]  The transcript includes testimony that only presents first
> names of some of the individuals.  One deputy believed Lakeyda's
> last name was "Bibbins."  This is reflected in a subpoena request in
> the record.  The transcript spells her name "Laquita."

> [FN 6]  Candice had known defendant for about one or two months
> prior to this night.

As Candice and Marvin were arguing, Whop, who was in the middle of the
street and parallel to defendant's car, said to Marvin, "Don't your girl got my
cousin's name on her."  Candice explained that Whop was talking about her,
apparently in reference to a tattoo she had.  Marvin asked Whop to repeat what he
said, and when Whop went to open his mouth, Marvin punched him.  Whop fell,
holding his jaw, and said, "Get him, Cuz."  Candice testified that after Whop said
this, defendant exited his car from the driver's side with a gun in his hand, raised
the gun, and started shooting.  She testified that the shooting started on Mt. Kennedy
in the middle of the street on the side of the "G6" and that defendant and Marvin
were very close to each other.  Candice testified that Marvin turned around and ran
down Rochester, a street perpendicular to Mt. Kennedy, and defendant ran down
the street behind him.  She said that defendant followed Marvin, and "they just kept
shooting."  According to Candice, defendant stopped shooting when he reached
Rochester, and then ran back to his gold car and left.[FN 7]

> [FN 7]  Candice testified that she did not see Marvin with a weapon
> or gun, but believed if he had one on him, he would have used the
> gun instead of punching Whop.

In the early morning hours following the shooting, which she believed might have occurred around 8:30 p.m., Candice identified defendant in a photographic lineup and also provided statements about the incident.[FN 8]  She testified that she was 100 percent positive that defendant was the person she saw shoot Marvin.  She also testified that she could not tell at the time of the shooting how many people were actually firing guns.

[FN 8]  Candice also identified "Chopper" (defendant) in court.

Candice said that Darius Duckett was in the vehicle with defendant when he arrived.  She had known Duckett for about one or two years from high school.  However, she did not know where Duckett was at the time of the shooting.[FN 9]  She testified that she did not know if Duckett had a gun, but thought it could be possible that Duckett was shooting a gun at Marvin, saying "I wouldn't put it passed [sic] him."  She said she believed all of the shots happened at the same time.  She said that defendant was wearing a white "tank" on the night of the incident, while Duckett was wearing all black.

[FN 9]  Candice identified Duckett in court as the person she knew as Darius Duckett.  She also knew that his nickname was "Dougie."

Bervin Wright testified that on the night of the shooting, he observed someone wearing a white tank top with a gun.  He recalled two guys leaving a car and going down the street.  He recalled that someone said, "they're shooting."  He was not able to make identifications, however.

Teri Creagh, a visitor from California who was in town for her nephew's graduation, was shot in her left thigh as she and other family members sought cover.  She did not see the person who fired the gun.  She testified that she heard gunshots being fired and thought they were coming from the driver's side of a vehicle parked behind her car.  Creagh testified that she did not know either defendant.

Casings and other ballistic evidence were collected from the scene.  A cluster of .380 caliber casings was found.  All of the .380 caliber casings were recovered between the street and the house at 3000 Mt. Kennedy Drive.  A cluster of .40 caliber casings was also found.  Additional .40 caliber casings were recovered down Rochester.  A projectile went through a telephone box close to the corner of Mt. Blanc and Rochester and lodged into the equipment.  Also, another projectile struck the residence at 3001 Mt. Blanc.

The ballistic evidence on the scene established that two types of guns were involved, a .40 caliber and a .380 caliber.  On Mt. Kennedy, five .380 caliber casings and one .40 caliber casing were recovered.  A total of six casings were found on Rochester, all .40 caliber casings.  The scene suggested that the starting point of the incident was at 3000 Mt. Kennedy, moving down Rochester to Mt. Blanc.

Jene Rauch of the Jefferson Parish Sheriff's Office Crime Lab testified as an expert in firearms examination and toolmark examination.  She examined cartridge casings and projectiles from the scene and then examined projectiles

collected from the autopsy and compared them. She examined six .380 caliber casings and determined that all were fired from the same weapon. She also examined seven .40 caliber casings and determined that all were fired from the same weapon. After examining the .380 caliber casings and the .40 caliber casings, she did not believe that they could have been fired from the same gun. She concluded that based on the evidence, at least two weapons were involved. She also compared two jacketed projectiles, which were received from the morgue, and determined that they were fired from the same weapon and were consistent with a .380 caliber weapon. No guns were located in connection with the shootings. Further, no gun was recovered from the victim, Marvin.[FN 10]

> [FN 10] A gunshot residue test was performed on the victim, but the results were presumptive negative.

Although only two projectiles were recovered from the victim's body during the autopsy, he sustained five separate gunshot wounds. Dr. Karen Ross, an expert in the field of forensic pathology, performed the autopsy and testified that the victim was alive when he sustained all wounds, as evidenced by the hemorrhage associated with each one. She concluded that of the five gunshot wounds, three of the wounds were consistent with back-to-front wounds, *i.e.*, the victim was shot from behind.

Deputy Abraham Andino of the Jefferson Parish Sheriff's Office also responded to the call on the night of the shooting to investigate the homicide.[FN 11] He explained that this was a large crime scene that started at the 3000 block of Mt. Kennedy and continued down Rochester.

> [FN 11] Deputy Andino believed the initial call came in around 9:42 p.m.

Deputy Andino interviewed Candice at the detective bureau. As a result of this interview, defendant was developed as a potential suspect in the shooting. Candice positively identified defendant in a photographic lineup and she also gave a statement. Deputy Andino located defendant and transported him to the detective bureau. After he indicated that he understood his rights, defendant gave a statement. In his initial statement, defendant did not indicate that he was involved in the shooting on Mt. Kennedy. In fact, he indicated that he was not even there.[FN 12] Deputy Andino testified that because defendant had his cell phone on him at the time, he requested and received consent to get the cell phone triangulations to see if he was in the area at the time of the shooting. However, defendant later changed his story and admitted in a second statement he was present at the time of the shooting. Defendant's second statement was transcribed and presented at trial. In this statement, defendant explained that the victim and "Whop" were in an altercation and then defendant ran after the victim to try and punch him and while he did this, he heard gunshots but did not see who was shooting. He said he heard a couple of gunshots and it sounded like it was different guns, perhaps three.

[FN 12]  Defendant's first statement was transcribed and presented at trial.  The transcript was also published to the jury.

Knowing that Whop, defendant, and a friend went to West Jefferson Hospital, Deputy Andino was able to pull the security tapes from the hospital.[FN 13]  An arrest warrant was prepared for defendant based on the investigation.  However, even after defendant was arrested, the case was not closed because it was believed that there was a second shooter.  Further investigation led the detectives to locate Duckett.

[FN 13]  Deputy Andino believed Whop's name was Donovan Dunbar Collins.  Despite efforts, the authorities had no success locating him for trial.

Duckett was read the rights of arrestee or suspect form on March 26, 2010, months after the incident.  Duckett gave a statement, wherein he testified that he knew Marvin from high school and admitted that Marvin picked on him and was a "bully towards" him.[FN 14]  He said he went to the party on the night of the shooting with his cousin Kevin in a "bluish colored gold" G6, which Kevin parked almost in front of the house.  He explained that Whop arrived at the party about 10 or 15 minutes after them and was in his "bluish turquoise color Gran Prix [sic]." Whop's girlfriend, Brittany, was with him, and they parked the vehicle across the street.  He said that he saw Marvin's girlfriend, Candice, walk towards Marvin and they began arguing.  He heard Donovan (Whop) say something about the tattoo Candice had of another man and Marvin came and "succor punched [sic]" Whop in his jaw.  After this, he recalled closing his eyes, putting his head down, and shooting.  He said he was in the middle of the street in front of a car.  He said he did not think he had hit Marvin when he saw him running away, so he ran towards the car and pulled off in the G6 he had arrived in.  He said the car had been left running.  He said Whop asked him for a gun, but he did not give him one and then Whop ran off and then more shots were fired.  He did not see anyone else shooting because he was in the car, facing the opposite direction.  He said he did not know where Kevin was at the time of the shooting and denied that he saw Kevin shoot.

[FN 14]  The transcript of the statement was published to the jury, and the taped statement was played in court.

Duckett believed he may have shot three times, but was not sure.  He said he did not really aim the gun at Marvin, but was shooting in his direction.  He said when he fired the gun, he was stationary and his head was down.  He claimed he shot in self-defense and knew Marvin had a firearm on him because he saw it on the right side of his hip.  He said that he had the gun for protection and was not sure of the kind of gun, but believed it was a semi-automatic and was probably "between a nine (9), something close to that."  He said the gun was tucked in his pants.  He said he shot Marvin to get away from him because he was scared when Marvin

came at him.  He said he did not intend to kill Marvin, but just wanted to get away from him.

Duckett said he went into the hospital with Whop and Brittany.  Whop's jaw was broken in three places.  He said he later hid the gun under a garbage can and that someone from the neighborhood took it and would not give it back.

An arrest warrant was later prepared for Duckett, and he was ultimately arrested.  Deputy Andino said that Duckett mentioned self-defense in his statement.  Deputy Andino testified that prior to Duckett's statement, they had the identity of one shooter, and then after his statement, they had identified two shooters.

Deputy Andino admitted that he took statements from various people and that no one said they saw Duckett fire a gun that night.  However, the crime scene suggested that there were two clusters of bullet casings in two separate locations.  The .380 caliber casings were in front of the house where the party was and the .40 caliber casings were down Rochester and behind a vehicle.  There were also .40 caliber casings that trailed down the street where the victim was located.  Candice said she saw defendant running behind the victim on Rochester firing a gun.  Deputy Andino agreed that the facts gleaned in the investigation did not conflict with the details given in Duckett's statement.  Deputy Andino testified that Duckett said he was stationary and close to the sidewalk while he fired his shots.  Deputy Andino believed that this was consistent with the .380 caliber casings found close to the sidewalk.

At trial, Duckett testified that he went to the party at 3000 Mt. Kennedy on August 22, 2009 with his cousin, defendant, in a G6.  Defendant drove and parked in front of the house.  Duckett said he got out of the car, but defendant remained in the car.  Duckett testified that he saw Candice and Marvin arguing in the middle of the street between Rochester and Mt. Kennedy.  The G6 was parked a few feet from where they were arguing.  Duckett admitted that he had previously had "words" with Marvin.  He said Marvin and Whop exchanged words and that Whop had said something about a tattoo on Candice for his cousin.  He saw Marvin punch Whop, saw defendant get out of his car, and then shots were fired.  Duckett testified that he saw defendant shoot.  Duckett said he observed Marvin running down Rochester, stumbling.  Duckett also said he heard a second set of shots, but did not know who fired them.

Duckett said that after the shooting, he got into the car Whop had arrived in that night.[FN 15]  He said that Brittany started driving them to the hospital, but that Whop and Brittany switched seats for Whop to drive because she was driving too slowly.  He said that he noticed that defendant pulled off behind them in the G6.  Duckett admitted that he was seen in the videotape walking into the hospital with defendant.  Duckett said he followed Whop to the bathroom, washed his hands, and left.  Duckett said he stayed at the hospital for about ten minutes.  Duckett went home after he left the hospital.

> [FN 15]  This conflicts with Duckett's account from his statement, wherein he said that he left with Holmes.

Duckett testified that he did not speak with the detectives until about seven months after the shooting. He said Deputy Andino brought up the issue of self-defense at the interview. Duckett said that he was told if he said it was self-defense, his cousin would go home and nothing would happen to him. He explained that the detectives wanted him to say his cousin did it. He also said he asked to speak to an attorney several times. He testified that his statement, which said he was the shooter, was not true. He said he lied because he wanted to help his cousin. He testified that he had nothing to do with the shooting.

On cross-examination, Duckett admitted he had signed an affidavit at defendant's attorney's office after he told defendant's attorney defendant did not fire a gun that night. He testified that it was not true that Marvin bullied him, as he had alleged in his statement. Duckett said everything else in his statement was true, except for when he said he was the shooter.[12]

### III.  Petitioner's Claims

### A. Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his convictions. On direct appeal, the Louisiana Fifth Circuit Court of Appeal denied that claim, holding:

Defendant argues that the evidence presented was insufficient for his convictions of second degree murder and attempted second degree murder when any rational juror could only conclude that one .380 caliber gun and one shooter caused the gunshot wounds sustained by the two victims. Defendant contends that the State failed to prove that the homicide victim was shot by two people when only one caliber bullet was retrieved from the victim. Defendant acknowledges that the bullets that caused injury to the surviving victim were never recovered, but provides that the only reasonable conclusion was that she was shot with a .380 caliber gun because of the location of where she was when she was shot and the casings found on Mt. Kennedy Drive. Defendant also argues that the State failed to prove the identity of the shooter who fired the .40 caliber rounds that produced the casings found closer to the victim's body, noting that even if the State had proved the identity of the .40 caliber shooter, it failed to prove that either of the victims was hit by a .40 caliber round.

Defendant concludes that whoever shot the .380 caliber gun on Mt. Kennedy Drive was responsible for the murder and attempted murder in this case. Defendant acknowledges that two witnesses, Candice and Duckett, testified that defendant shot a gun on Mt. Kennedy Drive. However, defendant explains that Candice's testimony contradicted the physical evidence and Duckett's testimony contradicted his earlier confession and was self-serving. Defendant contends that Duckett alone shot Marvin in self-defense, noting that he confessed and signed an affidavit saying defendant never fired a gun that night. Defendant also suggests that the physical evidence supports the details of Duckett's confession and that

---

[12] State v. Holmes, 119 So.3d 181, 185-89 (La. App. 5th Cir. 2013); State Rec., Vol. 1 of 7.

there was one person shooting at Marvin. He concludes only an irrational jury would convict two people of this murder and attempted murder.

The State responds that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. The State notes that defendant initially lied in his statement about being present at the scene of the shooting, defendant was identified as a shooter by a witness, and defendant admitted wearing clothing that matched the description of clothing that a witness observed being worn by someone running with a gun in his hand. The State provides that even assuming *arguendo* that the victims were not hit by the bullets fired by defendant, defendant would still be guilty as a principal under Louisiana law.

The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Ortiz, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La. 11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005) (quotation omitted). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. A review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. State v. Scott, 11-999 (La.App. 5 Cir. 5/31/12), 97 So.3d 1046, 1051.

"Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts." State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78, 83.

The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses' credibility, and when faced with a conflict in testimony, is free to accept

or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id. "[T]he Jackson standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." State v. Juluke, 98-0341 (La. 1/8/99), 725 So.2d 1291, 1293 (*per curiam*).

Defendant was convicted of second degree murder. La. R.S. 14:30.1 provides that second degree murder is the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the defendant's conduct. See State v. Graham, 420 So.2d 1126, 1127 (La. 1982); State v. Young, 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 95. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person, as well as the extent and severity of the victim's injuries. State v. Bannister, 11-602 (La.App. 5 Cir. 2/14/12), 88 So.3d 628, 634, writ denied, 12-0628 (La. 6/15/12), 90 So.3d 1060. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Spears, 05-0964 (La. 4/4/06), 929 So.2d 1219, 1224.

Defendant was also convicted of attempted second degree murder. La. R.S. 14:27 provides, in pertinent part, the following:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

The crime of attempted second degree murder requires proof, beyond a reasonable doubt, of the specific intent to kill a human being and the commission of an overt act in furtherance of that goal. State v. Bannister, 88 So.3d at 634. This Court has recognized that although specific intent to inflict great bodily harm is sufficient to support a second degree murder conviction, attempted second degree murder requires a specific intent to kill. Id.

Encompassed in proving the element of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Severin, 04-326 (La.App. 5 Cir. 9/28/04), 885 So.2d 609, 615, writ denied, 04-2805 (La. 3/11/05), 896 So.2d 64. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.

In the present case, Candice testified that she saw defendant Holmes exit a car, raise a gun, and start shooting at Marvin after Marvin punched Whop and

Whop said to "get" him. She also testified that defendant ran down the street behind the victim when he fled and was firing a gun. We find that a rational jury, finding Candice's testimony credible, could have found that defendant acted with specific intent to kill Marvin when, after Whop said to "get" Marvin, defendant fired a gun in his direction and chased him down the street after he fled, continuing to shoot. Defendant's action of aiming a lethal weapon and discharging it in the victim's direction supports a finding by the trier of fact that defendant acted with specific intent to kill. See State v. Gant, 942 So.2d 1099, 1111 (La.App. 5 Cir. 2006). Further, the victim sustained five gunshot wounds. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries. See State v. Bannister, 88 So.3d at 634.

Although the surviving victim appears to not have been the target of the shooting, testimony that defendant shot into the crowd is sufficient to establish a specific intent to kill for the attempted second degree murder conviction. In State v. Severin, 885 So.2d at 617, this Court recognized the following:

> Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. It is of no consequence whether defendant, in firing his weapon into a group of people, intended to hit one person or several people. In State v. Tyler, 342 So.2d 574 (La. 1977), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977), the defendant was convicted of first degree murder after firing a gun into a crowd. The Supreme Court found that the jurisprudence supported the proposition that shooting into a crowd indiscriminately with intent to kill someone was an assault with intent to kill each of them.

Id. In Severin, this Court found that the testimony elicited at trial that the defendant fired his gun into a crowd of people was sufficient to satisfy the intent requirement of the statute. Id.

Candice's testimony also supplied evidence as to defendant's identity as one of the perpetrators. Candice testified that she was 100 percent positive that defendant was shooting at Marvin. She also identified defendant in a photographic lineup. She knew defendant prior to the shooting for about one or two months. Positive identification by only one witness is sufficient to support a conviction. State v. Harris, 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.

Absent internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Caffery, 08-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La. 2/5/10), 27 So.3d 297. In this case, there was other evidence to support defendant's convictions, in addition to the testimony of Candice, who was an eyewitness in this case.

Candice believed defendant was wearing a white "tank" on the night of the incident. Another witness, Bervin Wright, although not able to make an identification, testified that he saw a person wearing a white tank top with a gun in

his hand on the night of the shooting.  In his second statement made to the police, defendant admitted that he was wearing a white t-shirt on the night of the shooting.

Defendant left the scene of the shooting and went to the hospital.  He then lied about his presence at the scene of the shooting in his initial statement, saying he was not there.  He later changed his story and admitted his presence after the deputy received consent for his cell phone records to check his location.  A defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience.  State v. Gant, 942 So.2d at 1111.

Although Duckett testified that he saw defendant shoot Marvin and this could be seen as self-serving testimony, ballistic evidence and testimony presented by the State shows that two separate guns were involved in this case.  Further, testimony was presented that more than one set of shots were heard.  In defendant's second statement, he stated that he heard a couple of gunshots that sounded like they came from different guns.  He believed it could have been "about three guns."  The jury could have found beyond a reasonable doubt that based on the evidence presented two shooters were involved.

Deputy Andino believed that Duckett's statement was consistent with the .380 caliber casings found close to the sidewalk on the scene.  Defendant argues that only the .380 caliber weapon fired shots that struck the victims in this case.  However, no projectile was recovered from the surviving victim's injury.[FN 16] As such, her injury was not linked to any particular projectile or weapon in this case.  Defendant is correct in that the two projectiles recovered from the homicide victim were determined to be fired from the same weapon and were consistent with a .380 caliber weapon.  However, the homicide victim sustained a total of five separate gunshot wounds.  Thus, three of the homicide victim's wounds were not linked to a particular projectile or weapon.  Additionally, Dr. Ross testified that the homicide victim was alive when he sustained all wounds, as evidenced by the hemorrhage associated with each one.  She also testified that the multiple gunshot wounds contributed to the victim's death.

> [FN 16]  This victim agreed that she had a "through and through" wound that went "in the back" and "out the front."

Further, defendant fails to acknowledge the law of principals.  Under La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."  Only those persons who "knowingly participate in planning or execution of a crime" are principals to that crime.  State v. King, 06-554 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-0371 (La. 5/4/07), 956 So.2d 600.  An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state.  Id.

A person may be convicted of an offense even if he has not personally fired the fatal shot.  State v. Page, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449-50, writ denied, 09-2684 (La. 6/4/10), 38 So.3d 299.  The law of principals states that all persons involved in the commission of a crime are equally culpable.  Id.;

see also State v. Massey, 11-357 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 463-64, writ denied, 12-0991 (La.9/21/12), 98 So.3d 332, where this Court noted that whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime.

After viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of second degree murder and attempted second degree murder beyond a reasonable doubt, including that defendant was a shooter in this case. As such, this assignment of error is without merit.[13]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[14]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that he has made no such showing.

As correctly noted by the Louisiana Fifth Circuit Court of Appeal, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v.

---

[13] State v. Holmes, 119 So.3d 181, 189-94 (La. App. 5th Cir. 2013); State Rec., Vol. 1 of 7.
[14] State v. Holmes, 130 So.3d 318 (La. 2014); State Rec., Vol. 1 of 7.

Smith, 565 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").  Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, only the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.   Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

In the instant case, Candice Cobena testified at trial that petitioner was one of the shooters involved in a shooting which resulted in the death of Marvin Newman and the wounding of Teri Creagh. That testimony alone was adequate to support petitioner's convictions, because it is clear that a single, uncorroborated eyewitness identification, if found credible by the trier of fact, is sufficient to prove identity and support a conviction under federal law. United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); accord Davis v. Cain, Civ. Action No. 15-6652, 2016 WL 4537915, at *7 (E.D. La. May 24, 2016), adopted, 2016 WL 4529877 (E.D. La. Aug. 30, 2016); Colbert v. Cain, Civ. Action No. 14-2472, 2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016), adopted, 2016 WL 4161257 (E.D. La. Aug. 5, 2016); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012). Here, however, there was additional corroborating evidence, such as the testimony of Bervin Wright and petitioner's co-defendant. Therefore, under federal constitutional standards, the evidence at trial was more than sufficient to support petitioner's convictions.

To the extent that petitioner is arguing that the jurors should not have found Cobena and the other adverse witnesses credible, that simply is not for this Court to say. Credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such matters of credibility. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips, 2012 WL 2564926, at *14; Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

Moreover, because the state proved that petitioner was one of the shooters, it is immaterial that the state failed to prove that his bullets hit Marvin Newman and Teri Creagh. As the state court noted, Louisiana law provides:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

La. Rev. Stat. Ann. § 14:24. Therefore, under the Louisiana law of principals, all persons involved in the commission of a crime are equally culpable, and it is of no consequence which of the perpetrators fired the actual shots that hit the victims. See, e.g., Washington v. Tanner, Civ. Action No. 13-6120, 2015 WL 13227943, at *14 (E.D. La. Dec. 11, 2015), adopted, 2016 WL 1253564 (E.D. La. Mar. 31, 2016); State v. Massey, 91 So.3d 453, 463-64 (La. App. 5th Cir. 2012); State v. Page, 28 So.3d 442, 449-50 (La. App. 5th Cir. 2009).

For all of these reasons, it simply cannot be said that the guilty verdicts in this case were *irrational* when the evidence is viewed *in the light most favorable to the prosecution*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## B. Severance

Petitioner next claims that his rights were violated by the trial court's denial of the defense motion for severance. On direct appeal, the Louisiana Fifth Circuit Court of Appeal denied that claim, holding:

> Defendant contends that he was prejudiced by the trial court's denial of his original and re-urged motion to sever. Defendant explains that the basis for the motion to sever was that there was only one gun used in the commission of the

murder and attempted murder charged, but two individuals were being charged, leaving the only possible argument that each defendant could present was that the other defendant had the gun and committed the shooting. Defendant argues that the denial of the motion to sever was erroneously based on a clear misrepresentation of the evidence that the State intended to produce at trial. Specifically, defendant contends that at the hearing on the motion to sever, the lead prosecutor told the judge that both separate caliber bullets were recovered from the victim's body, making it clear that the victim was shot by two weapons. Defendant claims the ballistic evidence proved the exact opposite and the State's experts testified that the only bullets recovered from the victim's body were .380 caliber bullets, and that those bullets were fired from the same weapon. Defendant claims that the motion to sever was re-urged during trial, but the trial court failed to rule on it.

Additionally, defendant argues that he was unable to present relevant evidence to the jury regarding his co-defendant's confession, including that Duckett was incarcerated in a different parish on a different charge at the time he gave his confession. Defendant also notes that the jury was never able to learn that an eyewitness provided a description of the lone shooter and that description matched Duckett. Defendant argues that if Duckett had not been a co-defendant there would have been no Confrontation Clause issue and the jury could have learned about this highly exculpatory identification. Defendant further argues that he was forced to defend against a second prosecutorial team – his co-defendant. Defendant argues that assuming *arguendo* that the antagonistic test was not proved based on the actions of the defendants during the State's case, it was made wholly apparent when Duckett took the stand in order to exculpate himself and point the finger at defendant.

The State responds that defendant did not offer any evidence in support of a severance, but only provided vague and general representations that the defenses presented at trial would be antagonistic. The State contends that these conclusory statements were insufficient to satisfy defendant's burden relative to the severance. Further, the State notes that this case involved two shooters and the matter was one of respective roles in the crime as to the two perpetrators. The State asserts that the trial court did not abuse its discretion in denying the motion for severance. The State acknowledges that the prosecution did make an inadvertent error in its pre-trial statement that there were two different caliber bullets recovered from the murder victim's body, but notes that the statement did not change the fact that the evidence proved that two shooters were involved in the criminal episode. The State concludes that the trial court's ruling denying the severance did not hinge upon the mistaken statement.

Further, the State contends that even if defendant could establish an abuse of discretion relative to the severance ruling, reversal of the conviction would not be warranted given the lack of demonstrable prejudice in this case. The State explains that Duckett's statement to the police did not implicate defendant and defendant had an opportunity to cross-examine Duckett at trial. The State further notes that defendant would have been faced with the same incriminating evidence of his guilt whether tried jointly or alone. The State also contends that defendant's argument that he could not present relevant evidence as to Duckett's confession at

a joint trial should not be credited because he fails to acknowledge that he was able to cross-examine Duckett in regard to the statement, and does not show the evidence which he allegedly could not present was admissible and/or particularly favorable.

On April 21, 2011, defendant filed a "Motion and Incorporated Memorandum for Severance and/or Separate Trials." In this motion, defendant argued that he believed his co-defendant would present a defense directly contradictory to his defense, suggesting that they would be antagonistic defenses. Defendant claimed that he would argue Duckett's statement that he was the shooter was truthful, but expected Duckett to claim his statement was false. Further, defendant suggested that he and his co-defendant would have to defend against each other and the State.

Later, on May 27, 2011, defendant's motion for severance was heard and denied. Duckett argued that it was not fair to defend against the State and his co-defendant at the same time. Defendant argued that the evidence did not support the theory that two individuals were firing shots from the same location. Defendant also argued that he would have to blame Duckett and prove the validity of Duckett's statement, and in return Duckett would say his statement, where he confessed, was false. Defendant claimed that this was not speculation and would happen since it was the only defense. The State argued that a severance was not required because its theory was that there were two shooters who had separate weapons involved in this case, noting the two sets of casings involved. The judge decided that trying the defendants together would not prohibit a defense and he agreed with the state that there was not a <u>Bruton</u> or <u>Crawford</u> problem.[FN 17] The judge also said that he did not believe that justice required a severance at that time. The motion was denied. Both defendants objected to this ruling.

> [FN 17] <u>Bruton v. United States</u>, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

On November 9, 2011, the day of trial, defendant and his co-defendant re-urged the motion for severance. Duckett argued that the defenses would be antagonistic and that each defendant would place the blame on the other for the shooting. Duckett argued that he would be denied the right to confront his accusers. Defendant also argued that the defenses would be antagonistic and that he would have to defend himself against his co-defendant and the State. The judge denied the motion, noting their objections. Thereafter, the co-defendants were tried together.

Defendant suggests that the inadvertent statement regarding the projectiles recovered from the homicide victim's body caused him to later re-urge his motion to sever during trial, a motion that defendant claims the trial court failed to rule on. However, as argued by the State in its brief, it appears that the context of the reference to a severance during trial by defendant pertained to evidence relating to matching casings from other crime scenes. The request briefly mentioned during trial appears unrelated to the misstatement regarding the projectiles recovered from

the homicide victim's body or the basis of the severance offered pre-trial or argued on appeal.

    After the defendants' convictions, Duckett filed a motion for a new trial, which included an argument regarding severance.   On December 12, 2011, Duckett's motion for a new trial was heard.   The court denied the motion for a new trial as to the severance, agreeing with the State that there was no prejudice to Duckett and that the case came down to the degree of culpability.   Defendant did not file a motion for new trial.

    La.C.Cr.P. art. 704 provides the following:

> Jointly indicted defendants shall be tried jointly unless:

> (1) The state elects to try them separately; or

> (2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.

    Whether justice requires a severance must be determined by the facts of each case.   State v. Prudholm, 446 So.2d 729, 741 (La. 1984); State v. Coe, 09-1012 (La.App. 5 Cir. 5/11/10), 40 So.3d 293, 301, writ denied 10-1245 (La. 12/17/10), 51 So.3d 17.   A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. State v. Coe, *supra*.   A denial of a motion to sever will not be overturned absent a clear abuse of discretion.   Id.[FN 18]

> [FN 18]   This Court has previously recognized that antagonistic defenses are not the only instances where the denial of a motion to sever will constitute an abuse of discretion.   Where the ends of justice will be best served by severance, it should be granted.   State v. Massey, 91 So.3d at 476; State v. Coe, 40 So.3d at 302.   See also State v. Webb, 424 So.2d 233, 236 (La. 1982).

    A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State.   State v. Prudholm, 446 So.2d at 741; State v. Coe, 40 So.3d at 301.   The defendant bears the burden of proof in a motion to sever.   State v. Coe, *supra*.   The mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance.   State v. Prudholm, 446 So.2d at 741; State v. Coe, 40 So.3d at 301. "Justice does not require severance where only the extent of participation of each defendant is at issue."   State v. Gaskin, 412 So.2d 1007, 1012-13 (La. 1982).

    Furthermore, the fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic.   Prejudice must be shown if defendants are to receive separate trials.   State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852, writ denied, 04-1399 (La. 11/8/04), 885 So.2d 1118.

In <u>State v. Williams</u>, 416 So.2d 914, 916 (La. 1982), the Louisiana Supreme Court noted that the policy consideration implicit in La.C.Cr.P. art. 704 situations is the reasonableness of presenting the entire case at one time. The Supreme Court recognized the following in <u>State v. Bradford</u>, 367 So.2d 745, 747 (La. 1978):

> Where a crime involves more than one actor, the need arises to balance the interest of the State in trial economy against the rights of defendants to separate trials. Joinder expedites the administration of justice, reduces the congestion of the trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve on juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.

> Another policy consideration implicit in the mandate of Article 704 that jointly indicted defendants shall be jointly tried is the need to present the whole case at one time where, as here, several defendants are involved in the same transaction. The State's policy is supported by the general principle that the State decides when, how, and whom to prosecute and should therefore be permitted to join offenders under appropriate circumstances.

<u>Id</u>. (internal citations omitted).

In the present case, this Court is reviewing the rulings on pre-trial motions for severance. In reviewing a pre-trial motion for severance, the Louisiana Supreme Court provided the following in <u>State v. Lavigne</u>, 412 So.2d 993, 997 (La. 1982): "It is incumbent upon us to review the validity of the ruling without regard to whether at trial substantial other evidence was introduced or whether his conviction would have been a certainty irrespective of the joint trial."[FN 19] La. Prac. Crim. Trial Prac. § 14:25 (4th ed.) explains the following regarding the differences in review depending on the timing of the motions for severance:

> If the motion to sever is not made until after the trial commences, the conviction will not be reversed for its denial even if a severance was warranted unless the court finds the defendant "would probably not have been convicted" at a separate trial. If the motion is made pretrial and denied, the appellate court may not consider the weight of the evidence or the certainty of the defendant's conviction in a separate trial in assessing the validity of the trial court's ruling.

> [FN 19] "When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the trial evidence will actually be; and after trial commences, the standard is stricter because at that time the trial judge is able to analyze the evidence which has actually been admitted." <u>State v. Foret</u>, 96-281 (La.App. 5 Cir. 11/14/96), 685 So.2d 210, 224 n. 9.

23

In the instant case, defendant failed to offer evidence in support of his pre-trial motions for severance. Instead, he only made general representations that the defenses presented at trial would be antagonistic. These conclusory statements alone were insufficient to satisfy his burden regarding the severance, especially when the prior statements by the defendants did not place blame on the other. Defendant's statements did not mention Duckett by name or implicate him in the shooting. Duckett confessed to being a shooter in his statement, without mentioning defendant or implicating him. Further, the State's theory in this case was that there were two shooters. As such, even if defendant blamed his co-defendant for the shooting and his co-defendant blamed him for the shooting, as defense counsel speculated in his arguments, this did not rule out the possibility that both defendants were shooters and the matter was actually one of respective roles in the crimes committed by the two perpetrators. Accordingly, we find that the trial judge did not abuse his discretion in denying the motion for a severance in this case.

Defendant suggests that the court's ruling on the severance is erroneous because it was based on the State's material factual misrepresentation that two different caliber bullets were recovered from the murder victim's body. Although defendant is correct that no projectiles recovered from the victim's body were linked to the .40 caliber weapon, defendant fails to show how justice required a severance when there was other evidence that two separate weapons were used in the shooting. The State's theory of the case was that there were two shooters, and this theory was based on the ballistic evidence recovered from the scene, including two separate types of casings. The judge did not suggest that his ruling was only based on the misrepresentation of the facts. Defendant has failed to demonstrate that justice required a severance or that he was prejudiced by the joint trial.

In <u>State v. Turner</u>, 365 So.2d 1352, 1354 (La. 1978), the Louisiana Supreme Court stated, in pertinent part, the following:

> Where it is clear from the record that a co-defendant would give exculpatory testimony if a severance were granted, the denial of a severance is an abuse of discretion. See, La.C.Cr.P. art. 704, Official Revision Comment (c)(2). However, the burden is on the movant to establish that the co-defendant would, in fact, testify at a separate trial, and the exculpatory nature of his proposed testimony. See, 8 Moore's Federal Practice, § 14.04(4).

In the instant case, defendant failed to demonstrate that co-defendant Duckett would, in fact, testify at a separate trial or that Duckett's testimony would exculpate him. Defendant suggests that there was evidence that he wanted to present regarding Duckett's incarceration and other things, but does not present how this evidence would have been admissible or favorable to him. Defendant suggests that had Duckett not been a co-defendant, there would have been no Confrontation Clause issue and the jury would have been able to learn about highly exculpatory identification evidence that an eyewitness provided a description of the

shooter and that description matched Duckett.  However, Duckett actually testified at trial and instead implicated defendant as the shooter.  Defendant was given the opportunity to cross-examine and confront Duckett at trial when Duckett implicated him.  Further, defendant was able to cross-examine Candice, who knew both Duckett and defendant prior to the shooting and who identified defendant as the shooter.

 Accordingly, we find that defendant failed to show how justice required a severance or how he was prejudiced by the trial court's denial of the severance, and thus we find that the trial court did not abuse its discretion in denying the motions for severance.  This assignment of error is without merit.[15]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[16]

 To the extent that petitioner is arguing that the state court erred in applying state law in denying his motion for severance, his claim simply is not cognizable in this federal proceeding. Simply put, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Charles v. Thaler, 629 F.3d 494, 500-01 (5th Cir. 2011) ("A federal court lacks authority to rule that a state court incorrectly interpreted its own law.  When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."); Molo v. Johnson, 207 F.3d 773, 776 n.9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); Hogue v. Johnson, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas); Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) (a federal habeas court does not sit as a "super" state supreme court to review errors under state law). Rather, federal habeas corpus relief may be granted only to remedy violations of the federal Constitution and laws of the United States; therefore, mere violations of *state* law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

---

[15] State v. Holmes, 119 So.3d 181, 194-98 (La. App. 5th Cir. 2013); State Rec., Vol. 1 of 7.
[16] State v. Holmes, 130 So.3d 318 (La. 2014); State Rec., Vol. 1 of 7.

To the extent that petitioner is contending that the denial of his severance motion violated *federal* law, his claim fares no better. The United States Sixth Circuit Court of Appeals has held:

> A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden. See United States v. Horton, 847 F.2d 313, 316 (6th Cir. 1988). As a general rule, joint trials are favored. See United States v. Dempsey, 733 F.2d 392, 398 (6th Cir. 1984). Jurors are presumed to follow the instructions of the court and to give each defendant's case separate consideration. See Francis v. Franklin, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The mere potential for confusion, standing alone, will not outweigh society's interest in the speedy and efficient resolution of criminal trials. See United States v. Moore, 917 F.2d 215, 222 (6th Cir. 1990).

Stanford v. Parker, 266 F.3d 442, 459 (6th Cir. 2001). Similarly, the United States Fifth Circuit Court of Appeals has explained:

> The United States Supreme Court has declined to mandate severance any time co-defendants have conflicting defenses. See Zafiro v. United States, 506 U.S. 534, 538-39, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Often, rather than sever a defendant's trial from that of a co-defendant, the trial court may simply provide a limiting instruction to cure any risk of prejudice. Id. at 539, 113 S.Ct. 933. The mere fact that co-defendants have "mutually antagonistic defenses" does not require the trial court to sever the case. Id. at 538, 113 S.Ct. 933. Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539, 113 S.Ct. 933.

Brown v. Dretke, 419 F.3d 365, 372 (5th Cir. 2005). Accord Fox v. Ward, 200 F.3d 1286, 1293 (10th Cir. 2000) ("Mutually antagonistic defenses are not prejudicial per se. In order to prevail on such a theory for severance, the defendant must show real prejudice, rather than merely note that each defendant is trying to exculpate himself while inculpating the other." (quotation marks and citation omitted)).

The instant case presents a classic scenario – two co-defendants are charged in a shooting arising from an altercation in which several individuals were present and involved, and each co-defendant tries to exculpate himself while simultaneously accusing the other. However, regardless of whether the co-defendants are tried together or separately, a jury could legitimately conclude

26

that one, both, or neither of the co-defendants fired shots during the altercation. Therefore, the mere fact that they were tried together despite the fact that their versions of what occurred was at odds in no way violated clearly established federal law as determined by the United States Supreme Court. Accordingly, federal habeas corpus relief is not warranted based on this claim.

## C.  Excessive Sentence

Petitioner also claims that his sentence on the attempted second degree murder conviction is excessive.[17]  On direct appeal, the Louisiana Fifth Circuit Court of Appeal denied petitioner's sentencing claim, holding:

> Defendant argues that his maximum 50-year sentence for attempted murder is constitutionally excessive and was not warranted in this case. He notes that there was no evidence that defendant had a violent past, and there was no evidence presented that indicated that defendant fired the weapon that caused Ms. Creagh's injury. Defendant argues that even assuming that the State proved that defendant was a principal to the attempted murder of Ms. Creagh, defendant should not receive the same sentence that the actual shooter received. Additionally, defendant argues that his sentence is excessive because of the consecutive nature of the sentences imposed as a result of a single occurrence. He contends that the judge failed to provide sufficient justification in light of the length of the sentences. He concludes that the sentences should be vacated and the case remanded for resentencing.
>
> The State responds that defendant has failed to demonstrate that the 50-year sentence is constitutionally excessive, noting that the trial judge amply articulated the basis for the 50-year sentence imposed after hearing the evidence presented at trial that one victim was shot as a bystander during the perpetration of another shooting where the victim was killed. The State provides that based on the factors in this case, defendant cannot demonstrate that the trial court abused its broad sentencing discretion. Finally, the State notes that defendant failed to make or file a motion to reconsider sentence on the basis of the consecutive nature of the sentences imposed and is not entitled to review of this issue on appeal.
>
> Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence for the conviction of second degree murder of Newman. He was also sentenced to 50 years imprisonment at hard labor for the conviction of attempted second degree murder of Ms. Creagh.

---

[17] Petitioner does not appear to be challenging his mandatory life sentence on the charge of second degree murder. However, even if he is, it is clear that a life sentence for the Louisiana crime of second degree murder is not considered excessive under federal constitutional standards. See, e.g., Lewis v. Warden, Louisiana State Penitentiary, Civ. Action No. 2:11-cv-1315, 2014 WL 5365401, at *10 (W.D. La. Oct. 21, 2014); Taylor v. Cain, Civ. Action No. 06-2482, 2007 WL 1805668, at *21 (E.D. La. June 22, 2007), aff'd, 545 F.3d 327 (5th Cir. 2008).

These sentences were ordered to run consecutively. Prior to imposition of the sentence, the homicide victim's mother provided a victim impact statement. Thereafter, the trial judge expressed that he recalled the case, noting that a fight commenced, and after someone was punched, the defendants decided to fire guns. He said he would have understood if they jumped into the fight, but did not understand why the guns became involved. The judge noted that the evidence showed that more than one gun was used and recognized that the victim was chased after the initial shooting. The judge also considered that another victim was struck with a bullet and that many more people could have been killed because the defendants did not like the way the fight "was going." He expressed his dislike for guns and with indiscriminate firing into a crowd at a party.

After imposition of the sentences, defense counsel said, "We object to the sentence." No specific objections to the sentences were made, and no motion to reconsider the sentences was filed.

The failure to file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence only for constitutional excessiveness. State v. Ragas, 07-3 (La.App. 5 Cir. 5/15/07), 960 So.2d 266, 272, writ denied, 07-1440 (La. 1/7/08), 973 So.2d 732, cert. denied, 555 U.S. 834, 129 S.Ct. 55, 172 L.Ed.2d 56 (2008); see also La.C.Cr.P. art. 881.1.[FN 20]

> [FN 20]  According to La.C.Cr.P. art. 881.1(E), the "[f]ailure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review."

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even when it is within the applicable statutory range, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Warmack, 07-311 (La.App. 5 Cir. 11/27/07), 973 So.2d 104, 109. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice. The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Berry, 08-151 (La.App. 5 Cir. 6/19/08), 989 So.2d 120, 131, writ denied, 08-1660 (La. 4/3/09), 6 So.3d 767.

In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Berry, supra. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and therefore, is given broad discretion in sentencing. State v. Williams, 03-3514 (La.12/13/04),

893 So.2d 7, 16. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Warmack, 973 So.2d at 109. "Sentence review under La. Const. art. 1, § 20 does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is most appropriate in a given case." State v. Williams, 07-1111 (La. 12/7/07), 969 So.2d 1251, 1252 (*per curiam*). The reviewing court must keep in mind that maximum sentences should only be imposed on the most egregious offenders. State v. Caffrey, 15 So.3d at 204.

In the present case, the judge provided adequate justification for imposing the maximum sentence of 50-year imprisonment for the attempted second degree murder conviction. As expressed by the judge, this case involved a fight at a party that turned deadly when the response to a punch was a shooting. More than one gun and shooter was involved, and the risk of harm to bystanders was significant and unfortunately realized by the surviving victim. Evidence was presented that defendant chased down one of the victims after the initial shooting commenced, putting anyone or anything in his path at jeopardy. Evidence of damage to a residence and to a telephone box was presented as well. Defendant had a complete disregard for the life and property of others. Further, despite eyewitness testimony that defendant was a shooter, defendant continued to deny his involvement in the matter.

Also, jurisprudence does not indicate that defendant's maximum 50-year sentence for attempted murder was unwarranted. In State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, writ denied, 03-0411 (La. 10/10/03), 855 So.2d 327, the defendant argued that his 50-year sentence for attempted second degree murder was excessive in light of his relatively young age and the fact that he was a first felony offender. This Court found that even though the trial court failed to give reasons for the sentence imposed and although the defendant was a first-time offender, his sentence was not excessive. This Court noted that a firearm was used to shoot a victim at a relatively close range and that the defendant pursued the victim as the victim attempted to flee in an apartment, where the defendant fired two more shots into the apartment with children present. This Court considered the multiple shots that were fired and the endangerment of the lives of others and found this sentence not to be excessive.

In State v. Ross, 42,399 (La.App. 2 Cir. 8/29/07), 965 So.2d 610, the court considered the senselessness, danger, and reprehensible nature of the crime and found that the 50-year sentence for attempted second degree murder was justified and not constitutionally excessive. The court noted that serious physical injuries resulted from a drive-by shooting and considered the defendant's continuing denial of guilt and his lack of remorse.

In State v. Sarpy, 10-700 (La.App. 3 Cir. 12/8/10), 52 So.3d 1032, writ denied, 11-0046 (La. 6/3/11), 63 So.3d 1006, the court found that the defendant's maximum 50-year sentence for attempted second degree murder and the imposition of a consecutive life sentence for second degree murder was not excessive. The court considered the fact that the defendant committed the crime in conjunction with second degree murder and the fact that the defendant committed the attempted second degree murder while on probation.

> As such, we find that the trial court did not abuse its sentencing discretion in this case. Additionally, this Court has held that when the consecutive nature of a sentence is not specifically raised in the trial court, the issue is not included in the bare constitutional excessiveness review and the defendant is precluded from raising the issue on appeal. State v. Hunter, 11-787 (La.App. 5 Cir. 4/24/12), 94 So.3d 797, 800. In the instant case, defendant failed to specifically object to the consecutive nature of his sentence. As such, defendant is not entitled to review of the consecutive nature of his sentences on appeal. Id. at 5, 94 So.3d at 800. This assignment of error is without merit.[18]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[19]

To the extent that petitioner is claiming that his sentence is excessive or otherwise inappropriate under Louisiana law, such state-law claims are not cognizable in this federal proceeding. As already noted herein, federal habeas corpus relief is available only to correct violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, a federal habeas court will not review the legality of a petitioner's sentence under state law. See, e.g., Nyberg v. Cain, Civ. Action No. 15-98, 2015 WL 1540423, at *12 (E.D. La. Apr. 7, 2015); Phillips v. Cain, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), adopted, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); Brunet v. Goodwin, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), adopted, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

On the other hand, to the extent that petitioner is claiming that his sentence is excessive under *federal* law, that claim obviously is cognizable; however, it is also meritless. Even considering petitioner's argument that his sentence is harsh because it is the maximum sentence permitted by the applicable statute, the mere fact that a sentence is harsh does not mean that it is

---

[18] State v. Holmes, 119 So.3d 181, 198-201 (La. App. 5th Cir. 2013); State Rec., Vol. 1 of 7.
[19] State v. Holmes, 130 So.3d 318 (La. 2014); State Rec., Vol. 1 of 7.

unconstitutionally excessive.  For the following reasons, petitioner's sentence does not cross that impermissible line.

In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed."  "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts." United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)).  "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Gonzales, 121 F.3d at 942 (quotation marks omitted). "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare." Id.  (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence.  Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment." Gonzales, 121 F.3d at 943.  In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses.  The sentence was imposed under a Texas recidivist

statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check.  The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law.  Nevertheless, we can say with certainty that the life sentence approved in Rummel falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

Here, petitioner's crime of attempted second degree murder was particularly serious and violent, and his sentence fell within the range provided by law.  In light of those considerations, as well as the finding in Rummel that a life sentence was not excessive for the relatively minor and nonviolent offenses involved in that case, this Court cannot conclude that petitioner's fifty-year sentence for his much graver offense is grossly disproportionate under federal law.  Because the sentence is not grossly disproportionate, this Court's "inquiry is finished."  Gonzales, 121 F.3d at 942.

Out of an abundance of caution, the Court notes that it appears that petitioner may also be claiming that the order that his sentences be served consecutively (rather than concurrently) rendered his punishment excessive under federal constitutional standards.  If so, that claim is likewise meritless.  Both of petitioner's sentences were individually valid, and the mere fact that valid individual sentences are ordered to be served consecutively generally is not alone sufficient to render a punishment unconstitutionally excessive.  On the contrary, "it would take an extraordinary set of circumstances to demonstrate that the cumulation of valid sentences for distinct offenses constitutes cruel and unusual punishment …." United States v. Golomb, 754 F.2d 86, 90 (2nd Cir. 1985); accord United States v. Aiello, 864 F.2d 257, 265 (2nd Cir. 1988) ("Eighth amendment analysis focuses on the sentence imposed for each specific crime, not on the

cumulative sentence."). The order that petitioner's sentences run consecutively is in no way extraordinary or a violation of clearly established federal law as determined by the United States Supreme Court.

Accordingly, for all of these reasons, petitioner's sentencing claim should be denied.

### D.  State Post-Conviction Proceedings

Lastly, petitioner asserts a number of claims challenging the manner in which the state district court adjudicated his post-conviction application. Specifically, he argues that the state district court erred in (1) applying the wrong burden of proof in the state conviction proceedings and denying his application without affording him evidentiary hearing, (2) ruling on the merits of his claims without first addressing the state's procedural objections, and (3) finding one of his state post-conviction claims procedurally barred. Lastly, he argues that this Court should address the merits of the post-conviction claim the state court found to be procedurally barred.

The first three of these claims suffer from the same fatal flaw: the purported errors on which they are based are alleged to have occurred *in the state post-conviction proceedings*. However, it is clear that federal habeas corpus relief cannot be granted to remedy errors which occurred in state post-conviction proceedings. As the United States Fifth Circuit Court of Appeals has explained:

> [O]ur circuit precedent makes abundantly clear that errors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief. See, e.g., Hallmark v. Johnson, 118 F.3d 1073, 1080 (5th Cir. 1997) ("[I]nfirmities in state habeas proceedings do not constitute grounds for relief in federal court."); Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotations omitted). Rather, we must find constitutional error at the trial or direct review level in order to issue the writ.

Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999); accord Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992); Pitts v. Tanner, Civ. Action No. 6:14-cv-3145, 2015 WL 10045174, at *23 (W.D. La. Dec. 14, 2015) ("To the extent that petitioner complains that the State Court denied his post-conviction application without holding an evidentiary hearing pursuant to Louisiana Code of Criminal Procedure article 929(A), that claim is not cognizable in this federal habeas corpus proceeding."), adopted, 2016 WL 554884 (W.D. La. Feb. 10, 2016); Austin v. Cain, Civ. Action No. 12-2992, 2013 WL 3983513, at *2 (E.D. La. July 31, 2013); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *23 (E.D. La. Oct. 29, 2009); Baham v. Allen Correctional Center, Civ. Action No. 07-4075, 2009 WL 3148757, at *3 (E.D. La. Sept. 30, 2009); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *6 (E.D. La. Dec. 11, 2008). Although application of this rule often proves harsh, the Fifth Circuit has emphatically held that it must nevertheless be followed, stating:

> We, as a federal appeals court entertaining a *federal* habeas corpus application, are without jurisdiction to review the constitutionality of [the petitioner's] state postconviction proceedings. Indeed, we are barred from doing so by our "no state habeas infirmities" rule. ... [O]ur hands are tied by the AEDPA, preventing our review of [the petitioner's] attack on his Louisiana postconviction proceedings, so we dutifully dismiss his claim.

Kinsel v. Cain, 647 F.3d 265, 273-74 (5th Cir. 2011) (footnote omitted).

In his final argument, petitioner contends that this Court should address the merits of the post-conviction claim denied by the state court as procedurally barred. In his post-conviction application, petitioner claimed that he was entitled to relief on the ground that the prosecutor made and left uncorrected a misrepresentation of material fact during the hearing on the severance motion. The state district court held that claim was procedurally barred under La. Code Crim. P. article 930.4(A) because it had been raised and fully litigated on appeal. [20] The claim was then

---

[20] State Rec., Vol. 2 of 7, Order dated March 31, 2015.

likewise denied on that same basis by both the Louisiana Fifth Circuit Court of Appeal[21] and the

Louisiana Supreme Court.[22]

Petitioner is correct in arguing that this Court is not precluded from reviewing his claim.

The United States Fifth Circuit Court of Appeals has expressly held that a federal court is not

barred from reviewing claims denied by the state courts based on article 930.4(A), explaining:

> There are three primer rules and a presumption behind today's ruling. First,
> "[w]hen a state-law default prevents the state court from reaching the merits of a
> federal claim, that claim can ordinarily not be reviewed in federal court." Ylst v.
> Nunnemaker, 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991).
> Second, if the last state court to reach the issue looks to its merits, then the federal
> courts are also free to review the issue on its merits. Id. Third, in determining
> whether to reach the merits of a petitioner's claim, the district court must look to
> the last state court decision. Id. To assist courts in deciding upon what grounds the
> last state court decision rests, the Supreme Court fashioned the following
> presumption: "where there has been one reasoned state judgment rejecting a federal
> claim, later unexplained orders upholding that judgment or rejecting the same claim
> rest upon the same ground." Id. at 803, 111 S.Ct. at 2594. The Court held that a
> strong showing would be required to rebut the presumption, but identified one
> situation in which the presumption would always be rebutted:
>
> > The only common circumstance in which the presumption is
> > unrealistic is that in which the later state decision rests upon a
> > prohibition against *further* state review – for example, an
> > unexplained denial of state habeas resting in fact upon a rule ...
> > preventing the relitigation on state habeas of claims raised on direct
> > appeal. In that circumstance, even though the presumption does not
> > posit the real reason for the later denial, it does produce a result ...
> > that is the correct one for federal habeas courts. Since a later state
> > decision based upon ineligibility for further state review neither
> > rests upon procedural default nor lifts a pre-existing procedural
> > default, its effect upon the availability of federal habeas is nil –
> > which is precisely the effect accorded by the "look-through"
> > presumption.
>
> Id. at 804 n. 3, 111 S.Ct. at 2595 n. 3. This is [petitioner]'s case. Article 930.4(A)
> precludes a Louisiana court from considering the merits of a claim that has already
> been raised on direct appeal. The bar imposed by article 930.4(A) is not a
> procedural bar in the traditional sense, nor is it a decision on the merits. It did not

---

[21] State v. Holmes, No. 15-KH-255 (La. App. 5th Cir. May 13, 2015); State Rec., Vol. 2 of 7.
[22] State v. Holmes, 177 So.3d 1058 (La. 2015); State Rec., Vol. 2 of 7.

> bar the district court from addressing the merits of [petitioner]'s insufficient evidence and jury charge claims.

Bennett v. Whitley, 41 F.3d 1581, 1582-83 (5th Cir. 1994). Nevertheless, although the prosecutorial misconduct claim is not procedurally barred, it does not entitle petitioner to relief for the following reasons.

Federal courts apply "a two-step analysis to charges of prosecutorial misconduct." United States v. Duffaut, 314 F.3d 203, 210 (5th Cir. 2002). A court first decides whether the prosecutor's actions were improper and, if so, the court then determines whether the actions "prejudiced the defendant's substantive rights." Id. With respect to that latter determination, the court asks whether the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). "A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." Foy v. Donnelly, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted). Therefore, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982).

As to the first step of that analysis, it is undisputed that the prosecutor stated at the pretrial severance hearing that bullets of different calibers were recovered from the victim's body. That was not true; although the bullet-casing evidence clearly reflected that bullets of different calibers were in fact found at the crime scene, all of the bullets recovered from the victim's body were of the same caliber. Therefore, regardless of whether the prosecutor's statement was intentional or merely inadvertent, it was incorrect and therefore improper.

However, proceeding to the second prong of the analysis, this Court simply cannot say that that the misstatement rendered petitioner's trial fundamentally unfair. As an initial matter, the

misstatement was ultimately immaterial – *even if the evidence had been properly stated*, severance was not warranted for the reasons previously explained. Further, and more importantly, the misstatement occurred at a pretrial hearing, *not* at trial in the presence of the jury. Therefore, it could not have affected the jury's verdict. Where, as here, there is no reasonable probability that the verdict might have been different but for the prosecutor's action, a petitioner cannot show the prejudice required for a due process claim.

Accordingly, although petitioner's prosecutorial misconduct claim is not procedurally barred, it is meritless and therefore cannot serve as a basis for federal habeas corpus relief.

## <u>RECOMMENDATION</u>

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Kevin Holmes be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[23]

New Orleans, Louisiana, this nineteenth day of May, 2017.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[23] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.